The Honorable, the Judges of the United States, Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States, Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and the Honorable Court. Good morning, everybody. Please be seated. Welcome to the Fourth Circuit. We have two cases for en banc hearing this morning, and we'll begin with Kadel v. Folwell. Mr. Knepper, whenever you're ready, sir. Thank you, Your Honor. May it please the Court, my name is John Knepper, and I represent the North Carolina State Health Plan. Insurance is a tradeoff. Protection against more risks costs more money. There is no law or regulation that requires the North Carolina State Health Plan to cover each member's medically necessary treatment. Whether or not a service is medically necessary to treat a specific diagnosis, the plan will still not pay for that treatment unless that particular risk is covered under the plan, and this refusal is not limited to plaintiffs. There are other benefits that are medically necessary the plan doesn't cover. IVF, specific infant formula, dry needling, which is a pain management technique that's replacing opioids, and proton beam therapy for cancer. The court below wrongly concluded that the plan's exclusion for treatment or studies leading to or in connection with sex changes or modifications in related care is a facial classification under the Equal Protection Clause. This is factually and analytically wrong. The exclusion relates to treatments that can be prescribed for specific diagnoses. It does not identify or classify individual plan members at all. The exclusion does not classify individuals on the basis of biological sex. It applies to all individuals. In this context, the word sex refers to the organs that are affected, not the individual patient's biological sex. Further, the exclusion does not classify individuals on the basis of gender identity. The classification does not depend on whether someone is transgender or not. The plaintiff's argument that a law excluding gender dysphoria would discriminate against transgender people as a class does not reflect the facial classification. It is proxy-based reasoning and needs to be analyzed as such as evidence of motive that is considered by the fact finder during a trial. The exclusion applies to every plan member. It applies both to transgender transitioners and cisgender de-transitioners. The but-for causation is established whenever a particular outcome would not have happened but for the purported cause. When you examine the operation and the classification here from the plan, it becomes clear that the distinctions here are based on diagnosis and treatment, the same kinds of distinctions that an insurance plan makes in every other context, rather than on the individual's identity or the individual applicant's as a person. Mr. Knepper, the plan covers, just as an example, a mastectomy following a diagnosis of cancer. Is that correct? That is correct. But the plan doesn't cover a mastectomy following the diagnosis of gender dysphoria if the patient has been advised by his or her doctor that that's part of the treatment. Isn't that correct? That is correct. So how do you justify that? But isn't the diagnosis of gender dysphoria inherently bound up in notions of sex and sexual identity? The diagnosis does relate to gender identity, but I want to be a little careful because sex classification is not the same as relates to sex. And I think that the key question, if you look at the reasoning, for example, that the Supreme Court used in Bostock for what's a but-for cause, the question is, change one thing and do you get a different result? And the exclusion here is, okay, I come forward. Didn't I just change one thing and got a different result? No, you're changing the diagnosis, Your Honor, which is not a classification. A diagnosis which is inherently bound up in sex and sexual identity? Well, Your Honor, I mean, I think that is the reasoning that was rejected by the Supreme Court in Geduldig. Because there really wouldn't be any difference in the answer to Judge Diaz's question. And pregnancy, as the Supreme Court looked at it in Geduldig and Doss, were there. No, exactly, Your Honor. The Supreme Court said, look, we understand that only women can be pregnant in Geduldig. That's not policed as a facial classification. That's policed by an investigation into motive and whether the exclusion was adopted because of the… If there's some unwritten provision that's not in the Constitution that exempts pregnancy from an equal protection analysis, then the same analysis that would apply in Geduldig and Doss would apply here. Yes, Your Honor, that's the plan's argument. Again, we don't claim that we are entitled to summary judgment in favor of the plan. The plan didn't move for summary judgment. The plan's position is that this should go back to the district court and there should be a trial to look for impermissible motive. But, I mean, I guess the difference in Geduldig is there was no comparable diagnosis that was being treated differently, right? That pregnancy is a condition unique to individuals, but there's no comparable condition that was being treated disparately. But here, you've got, back to my example, and there are others, you know, the gender-affirming treatment for hormones and the like that are in some plans, I guess this plan, provided to some people and not others. Isn't that the distinction? No, Your Honor, because in each case there are different diagnoses. And the record indicates that plaintiffs and every other plan member gets the same treatment for the same diagnoses. So if plaintiffs come forward and are suffering from breast cancer, like every other member of the plan, they receive the mastectomy. The distinction is not based on who they are or their identity. It's based on the medical diagnosis. Can I ask you a follow-up on the diagnosis point? The argument is that it doesn't discriminate based on gender or gender identity because it discriminates based on diagnosis. But aren't at least some of these diagnoses themselves inherently linked to a person's sex, I'm thinking of the example of hypogonadism, which literally can't be diagnosed without reference to someone's sex assigned at birth. So the diagnosis itself necessarily incorporates consideration of the person's sex assigned at birth. Why is that a classification based on sex assigned at birth? That is exactly what Godeldi rejects, Your Honor. The diagnosis of being pregnant does not depend on a person being biologically assigned female at birth. The diagnosis of being pregnant is the diagnosis of being pregnant. What, Your Honor? I don't have to determine what someone's genes are to determine whether or not they're pregnant. I don't have to determine what someone's sex assigned at birth was to determine if they're pregnant. I have to determine if they're pregnant. Here, I can't diagnose someone with at least some of these conditions without knowing what their sex assigned at birth was. So, I think you are asking, you know, this goes to one of the sort of sub-issues in the litigation below. But, you know, medicine is, you know, we're not contesting, and I don't believe the plaintiffs are contesting, that medicine itself, like the practice of medicine, is inherently sex-specific. That's what physicians do. In other words, the treatment for heart attack and heart risk is different depending on your biological makeup. And we're not attempting to say that should be treated differently. That's responsible medicine. Our point is we are presented with a diagnosis. We are presented with a treatment regimen for that diagnosis. And the plan does not look at sex, does not record or look at transgender identity. But, again, it does because it covers some diagnoses and doesn't cover other diagnoses that literally can't be made except by referential birth and sex. And the question, you know, I guess the response to that, Your Honor, is that when the Supreme Court in Bray was presented with a similar question, only women can receive an abortion. And the court said that itself, you can't adopt an ipso facto mode of analysis. You have to prove that that effect or that distinction was adopted because of the effect on the class rather than in spite of or with acknowledge of. And that is a mode of analysis, which this Court has repeatedly said is done by the fact finder, the jury at trial, not by the courts in a sort of racist or eloquitor type analysis. Let's say, as Hyden asked his question, a boy who wanted to remove breast tissue, you would cover that at birth, a boy at birth, or a male at birth. Would you cover that? The excess breast tissue, would you remove that? Would you cover that? That diagnosis is not in the record of excess breast tissue. I mean, the question is, what are the diagnoses and when are they prescribed? I mean, we haven't, you know, there's not a diagnosis discussed in the record of excessive breast tissue. Would you cover, the question is that in terms of, if a transgender woman wants to remove, a transgender male, I should say, wants to remove his breast, could you remove his breast? Would you cover that? It depends on what the biological, what the medical diagnosis is. The medical diagnosis is a transgender person who wants to identify as a transgender male and wants to have her breast, or his breast removed. Would you cover it? Well, this is what, the insurance plan, this is an insurance plan, Your Honor. Exactly, we're talking about people who work for the state and teachers and all those people. You have this, basically, gender change, surgery if it's transsexual, you prohibit it, don't you? First of all, we don't, the state health plan does not prohibit it. We don't cover it. We don't cover it. It's the same thing for a lot of people, not having health insurance covered is prohibiting it. Right. So, isn't that what you do? You said you can't change anything about your sex. No. Theology that's different than the one at birth. Well, first, Your Honor, in order to get coverage under the state health plan, you have to have an illness. So, the condition of transgenderism is not an illness. It's very clear. It's not an illness? No, absolutely not, Your Honor. Is it a medical condition that needs treatment? You deny that? Being transgender, and this is uncontested in the record, the experience of being transgender is not itself a mental illness. People who are transgender are not mentally ill. There are some, there's a subset, and in this record it's not clear what, there are no percentages provided. We could discern that from the experts. There are a subset of people who are transgender who suffer from gender dysphoria, which is a diagnosed psychological illness. And you ban coverage for any treatment for that? Again, the plan doesn't ban coverage. The plan simply does not cover certain treatments. Certain treatments? Certain treatments. There's no... Oh, on therapy? There's no restriction on therapy, Your Honor. The plan, and this is in our briefs, the plan's exclusion, you know, the plan... What about surgery, then? The plan does not cover surgeries, and it does not cover hormones or other drugs where there is a requirement for preauthorization. Isn't there, for lack of a better word, a portal under the plan? If you want coverage, there must be physical injury or disease. And that's the portal. You have to satisfy that for any number of coverages. And isn't that what distinguishes this situation? Yes, Your Honor. I mean, in order to seek coverage under the state health plan, you have to have an illness. That's what this is. This is a health insurance health benefit plan. The question was injury or disease. Do you agree with that, you have to have an injury or disease? That was the question. Yes, with the one modification that I want to make sure we understand that there are mental illnesses that are also covered by the plan. I think people would, you know, I don't want people to think somehow that those aren't injuries or very real diseases. So what do you call it when someone who has junior dysphoria and they have depression, severe depression, that could lead to all types of things, untreated, debilitating conditions, including self-mutilation and suicide? I was close to anything near the people who you do treat for mental disorders that you would cover. You wouldn't cover it. The fact that those things that, you're shaking your head. If you're pleading the record that untreated junior dysphoria can lead to those types of disabilities and severe depression and those things like that. Do you disagree with that? Your Honor. In this record? Well, what the plan, the plan does not, this is not in this case motivated. It sounds like you're asking me a motive question, which is, you know, are we saying that we don't care that. I'm not asking that you care. You said you treat mental illness and things like that. I'm just trying to see why wouldn't this fit in the category. Forget about your motives. The plan, like as with any other injury or disease or illness, the plan covers diagnoses and covers for each diagnosis certain treatments. So there are, you know, there are this distinction between. Do you cover severe depression? Absolutely. But it's covered, it's not covered with surgery. It's covered with the various mental health. How do you know it's not covered with surgery? You're saying that you would exclude surgery if somehow it was found that the mental disorder was related to something that was organic. You wouldn't cover surgery? That's what you said. Blankly wouldn't cover surgery. Well, there's currently an exclusion in the plan for surgery for psychological or emotional reasons. That's part of the overall, one of the overall exclusions that's at issue in this case. And so I can't, you know, not being aware of a specific surgery that would be prescribed, certainly one that's not experimental, which is another exclusion. I can't see any way that that would be covered. It doesn't mean that there's not one. If there is one, you know, the plan doesn't cover it. Counsel, Judge Gregory asked earlier about removal of breast tissue from a male. I think part of that question was for a situation where there was no disease or illness. Would that be covered? No, Your Honor. If there's not a medical diagnosis related to an illness that the plan covers, it doesn't cover removal of breast tissue or other medical procedures. You know, the key question the plan is always looking at is, what's your diagnosis and what is the treatment that's associated with this diagnosis? And then the next question is, is this one of the risks against which the plan ensures? Counsel, it does sound, the way you're putting it sounds one way, but am I right that the actual exclusion is termed as an exclusion for treatment in connection with sex changes or modifications? I mean, I'm still stumbling just as a matter of common sense over how an exclusion that is termed an exclusion for treatment in connection with sex changes or modifications is neutral as to someone's transgender status. Explain that to me like I'm in kindergarten. Sure. Your Honor, the exclusion applies equally to people whether they're male or female, so it's not a sex classification. And then your follow-up question, whether it's a discriminatory provision for transgender individuals, it applies equally in the same way. It applies to transgender people who are transitioning and to cisgender people who are detransitioning. We just don't make these changes or don't pay for them. And is that different from something like loving, you know, where either black people or white people can marry people of the opposite sex? Is that different from that kind of reasoning? Yes, Your Honor, because the relevant factor is not the individual's identity. The relevant factor is the individual's diagnosis. The person who is excluded is the person who wants treatment in connection with a sex change or modification, and I am just hung up on how that's not based on somebody's transgender status. And I want to put sex to one side, but we did say in Grimm that transgender status itself triggers intermediate scrutiny, and we're sitting on both, we don't have to stick with that, but assuming for the moment that we are, I'm just, I mean, I can't even phrase my question right. I'm just not, I just can't get around how is an exclusion for sex changes or modifications not based on a person's transgender status. Because, you know, again, factually the plan doesn't look at that. So this is not, for example, the Bostock reasoning where you're looking at somebody and saying, okay, if this was a man and dressed in a particular way, that person would be expired. If this person's a woman and dresses the same way, that person's fine. It just seems like, and I will let this drop in here, but neither cisgender people nor transgender people can have a sex change operation. And I don't find that very satisfactory. It does sound to me very much like loving. Black people can't marry white people. White people can't marry black people. Well, first of all, we don't prohibit anything. And second, I'm not excluded. But beyond that, we also don't, I think the critical point is, Your Honor, transgender people is not the class of people seeking a sex change. The class of people are individuals diagnosed with gender dysphoria. And that is a subset. It is correlated. But that's where the Dolby reasoning comes in. Can I just go back to the first question I asked you? How do I decide if the treatment that's going to be implemented is going to, you said leading to or in connection with? So put aside in connection with for a second. Leading to. How do I even determine whether the surgical intervention I'm about to do is going to lead to a sex change without knowing the person's sex assigned at birth? I don't even know how I'm supposed to figure out what that means without reference to the sex assigned at birth. Well, I mean, the way it's done. If you want this thing to lead to a sex change. Well, I mean, I don't love the term sex change because I think it doesn't add it. But I think it's over. It's archaic, but also I think it gloms together a number of procedures that are covered, that are sought under this rubric. From the plan's perspective, they look at what's the diagnosis code? What is the basis under which the physician is seeking to cover this? And that diagnosis code reflects the application of that physician's medical judgment to the individual and says this is why this individual needs medical care. And there are unquestionably illnesses that are specific to people of different biological sexes. But that, the Supreme Court said in Godot Lake, that itself isn't a basis for an equal protection violation. And then the plan simply looks at what is the illness that you're seeking coverage for and what are the procedures you're seeking coverage for. And the answer is if the procedures are some of the excluded procedures, they're not covered. Otherwise, they are covered. But again, all of the distinctions that are made about individual sex are not made by the plan. And they are not relevant to the plan's coverage criteria. They are made by the physician in the course of treating the individual and determining what specific illnesses that person suffers from. Go ahead. You referenced the Bostock causation standard. Do you have a position on whether Bostock applies to an equal protection plan? I think the court itself has suggested that it doesn't. I mean, there's the concurrence by the author of Bostock in Students for Fair Admission where Justice Gorsuch said, you know, equal protection is different. I think the critical distinction when you're in that kind of Bostock analysis, you're really looking for motive. You're trying to say, okay, why are you making this decision? And that is, in the context of equal protection, not a facial classification. Facial classifications are, you know, we're dividing the individual based on sex or gender. Is that a no or is that a no? Your Honor, we don't believe that Bostock changes the analysis. We don't believe it applies to equal protection analysis. Can I follow up on that? Sorry, I'm over here. It's hard to tell where we are. So I agree. So assume for a minute I agree with you that Bostock teaches us that it's not facial, right? That's the point of Bostock is that it wasn't facial. They were trying to get behind the facial classification. But in the equal protection clause context, we often try to get behind non-facial classification, right? That's the whole point of Arlington Heights. That's what Bray's talking about, about the yarmulke, right? I mean, the court says over and over in equal protection context cases that we're trying to figure out, was this done because of, not in spite of, the classification? And so I accept your first point that it doesn't do anything. In fact, I suggest this is not a facial classification. But doesn't the Bostock analysis inform whether this is based on sex? And so if we got past the facial classification, wouldn't we then look to the generally applicable principles that Bostock laid down? Your Honor, that is precisely what the fact finder does in the context of determining motive. And one way of establishing motive in the equal protection context, non-facially, may well be to look at Bostock's but-for analysis, and if you found whatever we want to think that analysis is, if you found that was satisfied, then that would show a but-for, not in spite of, motivation. Exactly, Your Honor. That analysis, you know, this court's been very clear that you can still have an equal protection violation even without a facial classification, but that requires an examination of motive, and that requires trial. That requires factual evaluation. The district court here declined to make any findings on motive. And so at this level, at the court of appeals level, the remedy to go back and do that work is to send this back down to the district court for trial. Thank you, Mr. Knepper. We've got time for rebuttal. Ms. Borelli. May it please the Court. Tara Borelli with Lambda Legal on behalf of the plaintiffs at Belize. I'd like to focus on three main issues today. I'll first explain why the district court was correct to find that the exclusion of issues facially discriminates against plan members based on their sex and transgender status. Second, I'll explain why Cadillac v. Sayo does not apply to this case. And third, I'll address why defendants' purported governmental interests cannot justify the exclusion. But let me begin with a couple of factual issues that came up during my colleague's argument. If you could just speak up just a little bit, I'd appreciate that. Thank you. Thank you, Your Honor. First, I want to address the question of whether gender dysphoria is a medical diagnosis. And on this record, the unrebutted evidence shows that it is. First of all, we have a Blue Cross Blue Shield policy. That's their own third-party administrator policy, the policy that they elected to use in 2017. And that policy says expressly on its face that when one meets the criteria for gender dysphoria, it is a medical condition, and it's stated in express terms in that policy. Let me ask you preliminarily on that question of diagnosis. Is that what we look at when we're looking at facial discrimination, or do we look at the text of the exclusion? I think you could look at both. I think I would start with the text of the exclusion. And I think that text, it's impossible to read it without finding sex discrimination. So, for example, the exclusion is a ban on coverage for sex changes or modifications. That's the language of the exclusion. And I think defendants have yet to offer a persuasive explanation for how a ban on sex changes is somehow not based on sex. So when we look at that text of all treatment that deals with sex changes, there's no reference that I see there to gender dysphoria. So, well, I think the exclusion itself answers the question. But defendants have said this discriminates based on gender dysphoria. Let's take that, the face value, and say that's the basis. But I'm looking at the text. It doesn't say anything about diagnosis either. Correct. Well, that's why we think it's so clearly just based on sex. That it's a classification of transgender people and a classification based on sex. But even looking at the diagnosis, the diagnosis itself is inextricably bound up in sex-related considerations. You can't say the diagnosis out loud without referring to sex. The diagnosis is called gender dysphoria. And you can't describe what gender dysphoria is. Suppose we disagree with you on whether this is a discrimination based on sex. And we see this as a treatment based neutrally on an illness rather than on gender. The question that I have is, what are we doing to the structure of the Constitution when you're asking us to intervene? We're telling the states what they can cover and what they cannot in their own insurance programs. And states have to balance their budgets and they have to look after their funds. They're stewards of those funds and they're limited. Now suppose a state just makes the choice that its limited funds are best spent on cancer treatments or on cardiovascular therapy or in stroke recovery. I mean, this is not the only illness out there. And why can't a state decide that the money that could have been spent on coverage for transgender-related issues should instead be spent to provide greater coverage for cancer, stroke, and heart attack victims? Now, absent some federal prohibition put down by CMS or tied to federal funding, I don't see how we can get into the business of saying to the states, Hey, you can cover this, but not that. Hey, you can do this, but not that. Who are we to be telling the states how they can insure their own employees? Why not cancer, heart, and stroke treatments? Your Honor, equal protection provides the framework that has to be applied to this exclusion here. Of course, an insurance plan draws all sorts of lines. But equal protection provides that those lines are facially neutral. But there's also the structure of the Constitution that's so focused on a very debatable question of equal protection law. We can go this way, we can go that way, and some judges might see it this way and some might see it that way. But given that the equal protection claim is highly disputable between two different points, legitimate points of view, doesn't the structure of the Constitution play into that and a respect for the sovereignty of the states over their own employees and how they wish to use limited funds to cover a rather broad range of illnesses? And how can we jump in and say, no, here's the way you should design your insurance program. That, absent some kind of federal prohibition and federal regulation or law which is tied to federal funding, and I don't see it here, it seems to me to assume a very imperial position for the federal judiciary to be making these sorts of dictations. Your Honor, I think that's the role that the 14th Amendment requires of the courts. It's particularly important for the courts to protect constitutional rights, especially when we're talking about classifications based on suspect or quasi-suspect classes. Do you agree that the equal protection issue is squarely presented here, correct? Yes, Your Honor. No statutory interpretation alternative here. It's an equal protection issue. That is correct. The equal protection claim is the only one on appeal to this court. There is a statutory claim that remains pending at the district court, but is not part of this appeal. This is an injunction appeal, an interlocutory appeal of an injunction issued by the district court. That's correct, Your Honor. Ms. Burleigh, my good friend Judge Wilkinson makes the very valid point that insurers have to make difficult decisions all the time with respect to coverage. As you point out, if there's an equal protection violation, then the courts should step in if there's been discriminatory actions taken against a particular suspect group. It seems to me that the costs are not relevant at that point. The insurer's decision has to comply with the law. In this case, as I recall in the record, maybe you can tell me, it wasn't a substantial amount of money that was being expended to cover these small group of employees and employers that needed the coverage. How much money are we talking about? That's correct, Your Honor. First, I do want to mention there is an answer to that question as a matter of law, which I think the court just alluded to, which is all government entities have to be concerned about limited resources, but balancing the public fisc has to be a shared burden. It can't be shunted onto the backs of a vulnerable minority group. But on the facts, the argument also fails. The plan's own 30B6 witness disclaimed this interest in her deposition. She said, quote, the cost of this benefit is not going to break the plan, never was, never will, end quote. And it's no wonder that she conceded that to directly answer the court's question. During the full calendar year that this care was covered, that was 2017, the cost came in at close to one one-hundredth of one percentage point of the plan's total annual premium, a drop in the bucket compared to the plan's positive cash-on-hand balance of more than $1 billion in 2018, the year after this care was provided. The court has never quantified it, in that it didn't do it in Godeldi, it didn't do it in Dobbs, it didn't do it in G.E. versus Gilbert, it didn't do it in Bray, it didn't do it in National Gas versus Savvy. Springfield's never gotten into that. I think it's just an additional reason to find that the government justification here is not an exceedingly persuasive interest, and this classification certainly is not substantially related to it. But if I might jump back to another discussion we were having about this. But preliminarily, this discussion that's going on, does this not turn in terms of the level of scrutiny that we apply here? I mean, if you're talking rational basis, you're kind of in this area, but there are those who think that this follows ground. It's transgender, it should be immediate scrutiny. Maybe someone thinks it's strict, but wouldn't that answer part of this cost analysis? Of course, there's a case that turned on that. Really, the basis upon which the other side relies on is in a footnote that deals with the classification distinctions, but it's an economic type case, from what I read, that deals with it. But wouldn't it basis that if we could agree as to what the basis is, it would help to inform the conversation. But if you've got some belief in a rational basis or some intermediate, you're going to have this back and forth, and it doesn't fit until you decide which category it goes in. I don't think cost can sustain this classification under any level of review. I agree that heightened scrutiny applies. I agree that under heightened scrutiny, cost is simply not an adequate justification. But even under rational basis, I would refer to the Department of Agriculture versus Moreno, where the Supreme Court examined a very similar interest under rational basis, avoiding fraud and waste in the federal food stamp program, and found under rational basis that that was not sufficiently closely related enough, even under rational basis, to justify the classification there. Your Honors, earlier we had some discussion about the fact that this exclusion occurs in the context of a health insurance plan, and I do want to just offer a few observations on that. Insurance plans are actually one of the core contexts in which the Supreme Court has found sex-based classifications and applied heightened scrutiny to them. And I would refer the Court to Frontier versus Richardson, Heckler versus Matthews, Wynwood versus Strugis Mutual, and Califano versus Goldfarb. Those are all examples of different insurance and benefits plans in which the Court found a sex-based classification and applied heightened scrutiny. Your colleague on the other side, this is not his only argument, but obviously an important component of his argument is his reliance on GDULDIG and the notion that the Court in that case made a distinction with respect to pregnancies, that it was a condition, not a sex-based discriminatory action, and upheld the exclusion. And I have to say it's a bit of a head-scratcher when you look at that in the context of where we are today and whether or not that case was actually correctly decided, but we're stuck with it. You are stuck with it. So tell me why that doesn't mean game, set, and match for you with respect to this case. GDULDIG is different from this case for two reasons. First, GDULDIG decided that one particular potential proxy, pregnancy, was not sufficiently closely related to be sex discrimination. But the Supreme Court has affirmed repeatedly in the decades since GDULDIG that discrimination based on a proxy for a protected characteristic is facial discrimination, and that includes in Royce v. Catano, Christian Legal Society, and Brayers v. Alexandria. Why doesn't GDULDIG fit in? Why is GDULDIG the exception then? Well, because it examined one particular proxy. This Court has already looked at and eliminated proxy discrimination. That remains a form of discrimination the Supreme Court has continued to recognize and to treat as facial discrimination. So the question in this case is, is a ban on sex changes, a ban on gender dysphoria, is that a closely enough related proxy for transgender people? And the answer is unequivocally yes. Well, GDULDIG is not an outlier. I mean, the Supreme Court just doubled down on it in Dobbs. I think Dobbs doesn't break any new ground. It simply applies that same analysis to another potential proxy, abortion care, and found that's not closely related enough in order to be a proxy for sex. In other words, for example— As the majority of the dissent in Bray discussed, say a voluntary abortion, the only people who are going to have that concern directly are women. It's like only women are going to be pregnant. Only trans individuals are going to be seeking this particular treatment. It's very hard for me to distinguish that out, unless you say there's some unwritten equal protection exception for pregnancy. I appreciate that question, Your Honor, because I think it points us to the second reason that GDULDIG was decided the way it was, which makes it a completely different case from this one, and that is that GDULDIG is the equivalent of a complete ban on pregnancy coverage. And Dobbs tells us that a complete ban on a procedure is not sex discrimination merely because it exclusively affects one group. But that's not what we have here. The equivalent here would be if the plan completely banned hysterectomies, for example. But the plan doesn't do that. The plan affords this care to a number of people and not others, and the line that it draws is whether it matches your birth content. That doesn't make sense, because GDULDIG provided the very same coverage. That was disability coverage. It wasn't treatment, but it was disability coverage to lots of non-pregnant people. So it's not that you're comparing apples and oranges. It provided the very same coverage for lots of disabilities. It just excluded pregnancy. And so this provides lots of mastectomies. If you've got cancer, you get a mastectomy, but you don't get it for this reason. So GDULDIG was different because it was a complete ban. No one received disability benefits for pregnancy. And I would look again to DOV, in part because it deals with procedures, and we're dealing here with procedures and medications. And what DOV says is if you completely ban a procedure, you completely ban abortion care, then that doesn't treat anybody differently, and it doesn't change just because that exclusively affects women. That's not enough to make it sex discrimination. But here the plaintiffs only seek access to the same surgeries, the same hormone therapy that is provided to cisgender people. That makes this case entirely different for GDULDIG. You have to go through the portal of injury or disease to get there, and that differentiates this. I appreciate the chance to address that. Gender dysphoria is a medical condition, just like the other medical conditions that are covered under the plan, and that's unrefuted on the record. I think you're mixing up terms that are not necessarily synonymous between condition, injury, and disease. Is there a lot of conditions that aren't going to fit those other definitions? We have a definition in North Carolina law that has been adopted by the health plan. It is the health plan's own definition of medical necessity, and it is a health condition, illness, injury, or disease. Treatment has to be in the standard of care, and it has to be not solely for the convenience of the patient. Repeatedly running throughout this record, we have confirmation that gender dysphoria meets that standard. It's on the face of the Blue Cross Blue Shield policy for treatment of gender dysphoria. We also have communications from Blue Cross Blue Shield to the plan when they were reviewing appeals of denials of this care, and those communications say, you cannot deny this care based on a lack of medical necessity. Gender dysphoria meets that statutory definition. It meets the plan's definition. If you're going to deny it, you have to deny it based on a lack of plan coverage, and that testimony is simply unreviewed. So what if there's a medical necessity for cosmetic surgery for emotional or psychological reasons? The plan bans that. So it is revisionist history for the plan to suggest that that exclusion has anything to do with banning this care. It was never invoked to deny care to any plaintiff, but even more importantly, Your Honor, defendants introduced a declaration from Blue Cross Blue Shield into the record, and that declaration says, we at Blue Cross Blue Shield have never enforced that exclusion. We don't even have a diagnostic code that connects to that exclusion in order to be able to enforce it. So it is simply, again, revisionist history to suggest that that exclusion has anything to do. We can see that as well when the plan moved to include this coverage in 2017 when the board met with plan staff, no one ever referenced that exclusion. They certainly didn't discuss it in detail. They never suspended it. That exclusion had nothing to do with the care when it was provided in 2017. But doesn't the sheer breadth of what you are urging us to do cause you at least some hesitancy? You're saying that every state in this whole wide country has to conform to your view of an insurance policy. And if the people of Wyoming feel differently from the people of New York, too bad. There's nothing they can do about it. And there's nothing Congress can do about it because the Due Process Clause of the Fifth Amendment is an analog to the Equal Protection Clause of the 14th as a restriction on Congress. And notwithstanding its own expertise and the role that it plays in federal funding of these insurance policies, there's nothing CMS can do about it. It's going to be my way or the highway for every doggone state. Nothing Congress can do. Nothing the states can do. Nothing CMS can do. I mean, the sheer breadth of this, of writing insurance policies on highly disputable constitutional theory, it's just staggering. Doesn't that cause you some hesitancy, the breadth of what you're urging? Your Honor, I think part of the answer to that is that the exclusion here is actually quite targeted. It's quite specific. And defendants have said repeatedly that this deals with a relatively small population. That's why I think this case is a particularly straightforward case. It's quite specific, but the equal protection, if there was a solid theory of equal protection, I could go along with that. But that is so different from the kinds of things that Brown v. Board of Education or any of the sex discrimination cases have addressed. This is just not the difference between night and day in terms of the clear-cut equal protection violations that issue in Brown and its progeny and Frontiero and its progeny. What you have here is you think it's sex discrimination. Other people think that it's tied to an illness and not to gender. Other people think that it's neutral because it covers male-to-female treatment and female-to-male treatment and the rest. But it is highly contestable. And in the face of this highly contestable equal protection doctrine, unprecedented, really, we're going to tell every state in the country how to run their insurance policies, how to treat their own employees, and not even the national legislature or the people of any state or the federal agencies that administer the funding. Not a doggone thing you can do. And doesn't that give you a little hesitation? I think that protecting people from sex discrimination by their government is one of our most cherished constitutions. Ms. Borrelli, you don't look old enough to have been around when Brown was decided, but Brown was highly contestable at the time, wasn't it? It certainly was, Your Honor. So it was loving, wasn't it? It was, Your Honor. So that argument, it just seems that whether or not it's today, I mean, that's the question, whether or not what we're facing here today is equivalent to those issues. And so to argue that it's contestable doesn't really answer the question, I don't think. And one thing that we certainly hope is not contestable is that transgender people are not strangers to the Equal Protection Clause. We think that applying sex discrimination principles here are required by a faithful application of constitutional jurisprudence in this court's precedent, and that that is one of the most important things that a court can do is to uphold those values to protect minority rights who are not able to protect themselves against majoritarian processes. Counsel, can I follow up on something you were talking about in the discussion, I think, with Judge Agee earlier, and maybe in response to Chief Judge Deeds' question about cost? I appreciate your point there, but does the issue of whether the cost is really significant or whether gender dysphoria is covered under the plan, those factors seem to me to go to intent if we go to intent. I'm just trying to figure out where those factors relate in our structure of our analysis. It seems to me if we were to decide it's not facially discriminatory, we would go to the Arlington Heights test, and those factors might very well come into play in the motivation of the exclusion. But isn't that where we would look at them and not whether it's facial or not? I would suggest, Your Honor, that the place this is situated in the analysis is looking at governmental interests. So regardless of whether it's facial discrimination, proxy... Fair enough. But that's my point. Once we decide the facial question, then we get into those factors. Right. We would test the governmental interests, whether they're sufficiently important and whether the classification is adequately tailored to them. Yeah, and your position would be even if it's a rational relation, it doesn't meet it. But that's the place in our analysis where we would grapple with those issues. That's correct, Your Honor. I do think that some of this evidence could also be used, could be looked at to determine intent if one is treating this as facially neutral and surveying all of the facts that are in the record, the board's debate, staff's presentation, one could look to all of that evidence to glean intent, which I think is also clear on the undisputed facts on this case. Well, let me ask you on the buildings because this whole business of costs, and when you think about that case, that was a case, as I said, the court discussed, you know, all about benefits. I mean, the fiscal and actuarial benefits of the insurance program throughout. Then on a footnote, dive into this whole business of the classification. It's an interesting case from my perspective because a majority of the judges concluded, well, all women, people who are pregnant are women. But it doesn't affect the actuarial benefit of the insurance because you've got the people who aren't pregnant are both men and women. I mean, that's one of the biggest fictions I've ever heard in my life, that someone who is pregnant, you wouldn't say you have to be pregnant because you're a woman, therefore it affects sex. You then look at the whole and say, well, it benefits both men and women who are not pregnant. But you get back to the, you just keep shaking your head, and say, no, a disability is based on pregnancy, that's just women. I mean, I know that case was 40 years ago, and the law, as you allude, maybe Dobbs might have just resurrected it with another majority factor on it. But that fiction is there. And Judge Wilkerson's statement of the world falls apart in the country because the insurance companies have to do something. But let's be clear, you're not saying, what you're saying is the Constitution requires it. And when the Constitution requires something, we don't get into business of what it's going to cost the country. If you don't like it, change the Constitution. Because we as a court don't make those kind of judgments. We look textually at what the Constitution requires here. And we look equally to make sure it's being applied across the board. That's the question in this case. But we won't get there if we're going to start out, first of all, and say, well, we're not even talking about, we're not even looking at facial discrimination. Notwithstanding, you can go both ways on it. Or we can't figure out which level of scrutiny. And if we're talking in two different veins on that, and then even we're taking the position that transgender is not connected to gender dysphoria, those are fundamental determinations. Those are the premises upon which we make this decision today. We can talk all over the world. But if you disagree on those things, you're going to be in a different camp altogether. And so I think that's kind of what we're going to have to do today is make those fundamental premise determinations of what we're talking about and where does it fit, in other words, structurally within our analysis. Otherwise, we're all over the place. But I think that when we look at Godovic, notwithstanding, that's a problem case, in my opinion. It justifies common sense. Notwithstanding the way in which it was analyzed, seeing the non, because then it slides back into the benefits of the insurance program and how it affects it. But really, we're talking about the classification. And I don't know if that was rational basis or whether it was some other level of scrutiny that we used. We certainly agree that Godovic has been the subject of a great deal of critique. We, of course, accept that it is binding. I just think it is inapplicable for the reasons mentioned. But on the point about cost, Your Honor, if I understood that question correctly, I hear the court alluding to the legal answer to that question. And the legal answer is that the 14th Amendment doesn't just allow for equal protection when doing so. It's free. As one example, it would save the health plan money if they could pay their female staff half their wages. The Equal Protection Clause doesn't allow that either. And so I think that's the answer to that. Counsel, I have a question regarding you, I guess, in follow-up to Judge Witt. On Godovic, it's my understanding in looking at the analysis, one of the things that the court did was consider the definition of pregnancy. Is that correct? And that sex is not in the definition of pregnancy to determine if it was spatially discriminatory. Here, the word is gender dysphoria, transgender, transsex. I don't, am I correct in understanding that the analysis, that Godovic would not be applicable here because the analysis, if you look at that analysis, the word gender, the word sex, is repeatedly in the definition of gender dysphoria. It's in the very title of the, according to the DSA-5. That's correct. And that's one of the things that completely separates this case from Godovic. You can't say gender dysphoria without referencing sex. You can't define it without referencing sex. Pregnancy, on the other hand, the only question that Godovic asks is, are you pregnant? The exclusion here asks, are you changing your sex? In other words, Godovic determined, in essence, that being pregnant doesn't define women. But the line here, he is a proxy for being transgender. And Williams v. Kincaid recognized that. Can I ask a follow-up on that? Yes, Your Honor. You said it is, the exclusion here is about are you changing your sex. And we talked about that that comes from a diagnosis of gender dysphoria. But do you agree, I take it, that the class of people who do not have gender dysphoria include some transgender people? Because it's a treatable condition, Your Honor. There are transgender people who do not have a gender dysphoria diagnosis. Some don't have access to clinical care. And so if they don't, they might not be diagnosed with gender dysphoria. But that discussion... Well, I thought it was more than that. I thought the record reflected that not all transgender people suffer from this discomfort that leads to the gender dysphoria diagnosis. So that in Godotic terms, whether we like them or not, the class of people who is not covered are people with a certain gender dysphoria diagnosis. And the class of people who are supposedly benefited by not providing coverage for that includes transgender and non-transgender people, people without a gender dysphoria diagnosis. I don't think anything changes the fact... Is that right? I apologize. Could you repeat the question again? Does the class of people who are supposedly benefited under Godotic include transgender, non-transgender people? Sorry, benefited under Godotic? Yes, the group of people who don't have gender dysphoria. Not all transgender people have gender dysphoria. That's what the record was like, right? I thought you agreed with that earlier. Yes, some have received treatment and they may not be experiencing gender dysphoria anymore. Godotic explained, as Judge Lynn was just discussing, that the group of people who are supposedly benefited by not paying for certain coverages, in Godotic it was men and non-pregnant women. And so here the group is people who are not transgender and people who are transgender but don't suffer from gender dysphoria, if we're speaking in Godotic terms. So that analysis was all about whether there's a close enough proxy. And the court said in Godotic there's not a close enough proxy because... I guess I'm just asking, do you agree that that is the group of people that we're comparing? This exclusion compares transgender people to cisgender people. Only transgender people... What's that exclusion about? I thought we were saying it's about gender dysphoria. Well, on its face it says sex changes. That refers to treatment for gender dysphoria. That is only transgender people and there was no dispute in fact about that on this record. It's not pregnancy, it's just women. But the difference there is that you have exclusive impact on women but a categorical ban. And if you have a categorical ban, categorical exclusion on care, exclusive impact alone doesn't make it sex discrimination. Here we have the opposite. We don't have an exclusive ban on any of the care plaintiffs seek because by definition, plaintiffs are seeking the same form of care. Disability benefits were provided for all sorts of other disabilities, all sorts of diagnoses, if not for the diagnosis of pregnancy. So I think, again, that's back to the kind of apples and oranges distinction you're trying to draw here. Adulthood is a problem for you and we may agree or disagree with the Supreme Court on that but it's still the law and I'm still not saying that it's an issue. But I appreciate your answer. When we're looking at equal protection and whether or not it's facial discrimination, you have to look at what is the class.  not people with dysphoria broadly but it's people with dysphoria who want surgery, but sex to adjust their physical genitalia with their identity. It's not just dysphoria where everybody with gender dysphoria doesn't have neither. That's correct because that's not the claim. You have to get it at the right level. The first level is what is the suspect class and it's people with gender dysphoria who require surgery and there's no dispute about that in terms of their level of where they are in terms of their continual treatment that surgery is indicated medically. And whether you get it or not is determined by somebody figuring out when you were born, what was your sex? And based on that finding, which is finding solely on sex, you get it or not. Is that correct? That's correct. We have evidence to support that, Your Honor. This only affects transgender people and the evidence to support that can be seen in the debate board, the presentation by the staff, the board minutes when they decided to provide this coverage for 2017. Everybody understood. It's all over those documents. Everybody understood that this affected transgender people and transgender people only and that's the group affected by this exclusion. But it doesn't include all transgender people. I think the point that Judge Rushing was making is that the condition addressed are people diagnosed with dysphoria. So that that condition is the excluded condition and that there are transgender people who don't have dysphoria. Yes. So it doesn't fit the model that you just asserted. Well, Your Honor, my understanding is that speaks to this issue of does it defeat an equal protection claim that only a subset of a group is affected? And the answer from the Supreme Court is unequivocally no and we see that explicitly in Rice v. Caetano, Nyquist v. McClay. In Virginia Military Institute, in that litigation, the Supreme Court assumed that the majority of women would not want to attend the Virginia Military Institute. That didn't make it any less a sex-based classification to the women who did. Except this insurance policy doesn't focus on those types of facts. This policy focuses on a condition of dysphoria. And the byproduct of treating dysphoria. And dysphoria includes some transgender, but not all. And the other difficulty, of course, is this may be the first instance where a court would force a medical condition to give rise to a physical operation where the physical condition is not diseased or injured. In other words, the only reason for doing the surgery is to accommodate the mental condition, but there's nothing wrong with the physical parts. There's no disease on that. And if we acknowledge that cosmetic surgery can be excluded, even if the surgery is related to depression or some serious mental condition, what you're now suggesting is that dysphoria, which is a mental condition and can be treated, exists with respect to all transgenders. And I don't think the record supports that. Your Honor, recognizing I'm over time, I won't subject the court to repetition, but I do want to make sure I respond by saying the plan has a definition of medical necessity, and it is the definition that they use for cisgender people, so it has to be the same test, the same definition that would be applied to transgender people. We're talking about facial classification. We're not going down to that detail at this point, but facial classification are those people, if there's a medical condition that is being addressed by the insurance and excluded by the insurance, and the medical condition that's excluded is dysphoria and related matters related to dysphoria. If you don't have an adverse medical condition, a disease or injury or condition that requires medical treatment, then the plan doesn't apply at all. It's not even in consideration, and we have transgender people that fit that classification. And the classification drawn is explicitly sex-based and also a proxy for transgender status, and we think that's what sets the level of review. Thank you, Ms. Barreiro. Oh, sure, go ahead. This is not an equal protection question. It goes to one of the expert witnesses, Dr. Haroos, who is an endocrinologist, and he wasn't any endocrinologist. He was the head of pediatric endocrinology at Washington University, and I think it was uncontested in the record that he had treated hundreds of children and adolescents for sexual dysfunction, including a lot of them treated for gender dysphoria. No, I'm... If you'll wait, please. I apologize, Your Honor. There was a clinic being developed for children in transducer medicine, which would report to him, as I understand the record, and even though the district court excluded Dr. Lampert because he wasn't an endocrinologist, it barred him from offering testimony as to causation and treatment, which it seemed like he was eminently qualified to do, and I didn't see the district court really dealt with any of those things. Thank you, Your Honor, and I apologize for my interruption earlier. Here's how the district court treated Dr. Haroos. So the testimony shows that he has not, for his admission, treated gender dysphoria. He has treated side effects. He's treated the after effects. Correct. He hasn't treated it in the first instance because he thinks it's a faulty diagnosis. It's medically not necessary. But he wasn't going to testify as to that. And notwithstanding that, the court still found him qualified and admitted testimony from him about the risks related to endocrinology because that is his field of discipline, but the court didn't find him qualified to do as to opine about surgery or about mental health care. He's neither trained nor practicing nor researching in any of those fields, and so he can't offer a reliable opinion, but when it comes to his field of endocrinology, the court accepted that he should testify. But under the rule, knowledge in and of itself, which she seemed to show in substantial portion, qualifies separately under Rule 702, and I just don't see that the district court ever grappled with that. I read the relevant portion of the district court's opinion to be where she says, the standard binds me to take all inferences in the most favorable light to the non-moving party, and applying that to the experts, all of the experts who testified in this, and all of the descendants' experts, they still don't create, and I take at face value all their admissible testimony, including Dr. Fruese's opinions in his field of endocrinology, it still doesn't create a material dispute effect. At most, it contests the relevance or the reliability of some, but certainly not all, of plaintiff's evidence that this care is medically necessary and medically efficacious. I have one clarification I would like. As I understand it, the position is that all individuals with gender dysphoria are transgender. Is that correct? Yes, Your Honor. But not all transgender people have gender dysphoria. Correct. And comparatively, the court understood that all persons who were pregnant were women, but not all women were pregnant. But they didn't compare that. What they compared was the group of men and women who were not pregnant. And here, the comparison is not with transgender, but with cisgender. So is that the differentiation? Because I'm trying to understand this whole business of comparing women or those who have dysphoria and those who are transgender. But if you don't accept, as I said, the premises that all individuals with dysphoria are transgender, then you kind of lose it. The other thing that kind of is somewhat confusing, but in all these cases, at some point in time, an appellate court is grappling with law and it's grappling with facts. And we're talking a lot of medicine up here about things, quite frankly, just like that doctor's not qualified to talk about it, we really aren't either. So we have to rely upon what the record discloses here. There are entities, this is what they do. And while we have our personal understanding of what a transgender person is and what they do, that's not our expertise. We deal with the law on it. And to me, that really gets grappled and really gets... The Supreme Court's done it, we all do. We get into making these statements about what individuals and what groups do and how it affects them, but it needs to point at some point back to an expert or something that establishes that fact and a trial judge that's made to finding a fact and determine whether there's abuse of discretion or there's not evidence to support it, and then look at the law. And sometimes I think... We spend a lot of time talking facts, but that's not what we do. Your Honor, one of the things that I think, that I hope will be particularly helpful with deciding this case is that the Fourth Circuit has an especially well-developed jurisprudence with respect to transgender people. The Grimm case, the Williams v. Kincaid case, both involve extensive discussion of understanding transgender people and gender disparities. The question is, are they closely connected? And there is no way on the law or on this record to answer that question with anything other than yes. They are closely connected. When we look at the definition of the diagnosis and the definition of being transgender, the overlap between the two, the inextricable interrelationship between the two, answers that question. Thank you very much, Mr. Merlin. Thank you, Your Honor. Mr. Knepper. Thank you, Your Honor. There were just a couple of things I wanted to return to because I think the first is, briefly, the discussion of medical necessity. The concept of medical necessity incorporates diagnosis. In other words, whether something is medically necessary, medically necessary to treat what? It, again, ties together what is your illness and what is the treatment you're receiving. So I think it's important to say you can't do as the district court did below or as has been suggested here and simply say, well, medical necessity is its own sort of separate connection between people, especially when, as is in the record, there's no requirement that the plan cover something just because it's medically necessary. On Goduldig, I just want to make a brief clarification. The Goduldig plan wasn't a complete ban on coverage for pregnancy, so I don't quite know how that distinction is made. I mean, in that case, the disability coverage was for so-called normal pregnancy. That's what was not covered under the plan as it was reviewed by the Supreme Court. So I don't know that you can make a distinction by saying the Goduldig case dealt with a complete ban on pregnancy coverage, whereas this deals with something short of that or different from that. Would it have changed the outcome? I'm sorry? Would that have changed the outcome? Your Honor, I think the point of Goduldig is that proxy reasoning is not a facial classification, and proxy reasoning is policed by inquiring the motive. Well, the teaching of Goduldig that's applicable, it seems to me, that has to be addressed by us is whether the classification is all women or just women or just a condition applicable to someone. And it seems to me, in view of the record in this case, that transgender persons are not all suffer from dysphoria, and the plan denies medical treatment just for treatment of dysphoria and related conditions. It seems to me that analogy is strong. It's not a necessary classification against transgenders. It's against a condition. And I think that's the learning that Goduldig would supply here in connection with that fact. And I don't think that's a fact that we as a court are making. It seems to me that's just an undisputed aspect of the record. That is. And experts on both sides concurred on that point. Can I ask you a question? Did you say that you think after Goduldig there's no more proxy reasoning in the legal protection field? No, Your Honor. But this is precisely... I'm glad you asked that, because I wanted to come back to your question on loving. I wonder if you could stay with this. Yeah, sure. The issue is not that proxy determinations cannot be violations of the Equal Protection Clause. The question we're asking here is whether they are facial discrimination. Even so, I feel like the Supreme Court has been pretty clear that things like bans on same-sex relationships, we treat those as facial classifications based on sexual orientation, even though not all gay and lesbian people in any given moment are engaged in a same-sex relationship. And I think that, you know, the question, right, is what is the distinction that is being made, for example, in loving and disgrace? I guess the question is, I would phrase it as, if we think the Supreme Court means what it says when it says that bans on same-sex relationships or same-sex conduct, we can treat those as facial classifications based on sexual orientation. Why isn't this case more like that than it is like it always was? Sure. Because, Your Honor, in those cases, the distinction and... I mean, in the conduct cases, right, they're still saying that they're inextricably linked to the actual sex, right? They're not saying that... But we agree that in those cases, there are plenty of gay and lesbian people who are not involved in same-sex relationships, so it doesn't matter that on the other side of the line we have both gay and lesbian people and straight people. But I think the distinction is, for example, let's just use loving, I think, because it's clear, and I want to get back to Burger Feld because I don't want to evade it, but loving, I think, sort of lays it out clearly, right? When you look at the statute of loving, the statute of loving explicitly makes a distinction based on race. That is a protected classification. And then it provides a benefit to some people. Some people can get married. You can marry someone of the same race. You just can't marry someone of a different race. And so the government is saying, this is a benefit and it's available to some and not to others, and the critical question about whether you are able to access this benefit is your race. Here, no one gets surgery. No one gets changes to their sex. No one gets, you know, for this diagnosis. Period. It doesn't matter whether you are male, female, transgender, not transgender. And so there's no benefit, there's no distinction that's being made between the individuals based on that criteria. Now, the next question is, oh, well, don't we know that this only affects transgender people, which is proxy-based reasoning, Your Honor. And I think that is, you know, the kind of evidence of motive that we would expect to be covered in trial, but is not itself a classification. You know, Lawrence Wong, like it turns out, a damn same-sex sodomy is not a facial determination based on sexual orientation. It's just, you know, it's just common. Well, I guess I would say Lawrence is about, you know, a government's attempt to intrude into how people conduct themselves, and this is simply what, in a government benefit program that's been created, what are the obligations on the government in terms of how it looks at what it's going to pay for and what it's not. And so long as they're making a distinction based on the risks, i.e. based on the illness, that's permissible. If they were to say, for example, transgender people can't get X, that's a facial classification. You would have to justify it as a facial classification. Okay, what do you think about Judge Harris? What if they say people who engage in this sort of conduct prohibited by the statute of the issue of the law can't get health insurance coverage? In your view, that's not facial classification? No, I'd say that. I mean, you're distinguishing between people based on a class. You're distinguishing between people who are saying, these people can have it, these people can't. That's the distinction. Why don't you do that here? For example, gender dysphoria is not mentioned in the exclusion, is it? No, Your Honor. It's not, is it? No. No. So this thing about this covers all people with gender dysphoria and all people with gender dysphoria don't need surgery or want surgery. Those are red herrings. Matter of fact, it says treatment or studies leading, that's what it excludes, treatment or studies leading to or in connection with sex changes or modifications and related care. So then, again, those are people who have to determine whether you've hidden this exclusion. You have to do a hunt as to what their sex was at birth, correct? You have to. If you don't, how would you know whether it's a sex change if you don't know what their sex was at birth? Your Honor, we look solely at what's the diagnosis. No, no, no. No, this has nothing to do with diagnosis. This is treatment or studies leading to or in connection with sex changes or modifications and related care. How do you know whether it's a sex change if you don't inquire specifically into what their sex was at birth to determine whether they're prohibited, they're excluded? How? Your Honor? Answer that exact question. I want to hear around the bush. Answer that question. How do you determine a sex change excluding you from this benefit without determining what their sex was at birth? The unrebutted evidence is the plan looks at what is your treatment? What is this treatment and why are you receiving this treatment? If you find out why they want the treatment and what the diagnosis is, how do you know whether it's excluded by the prohibition on sex change without knowing what their sex was at birth? I just want to know, how do you do that? Your Honor, do the physicians know? Oh, no, no. I know how you find out. I'm saying how did you do it without making that determination and that determination alone excludes you. No matter what your diagnosis is, how serious it is, or what the implications might be, how dire they are, if it's sex change, you're prohibited. You're excluded, period. End of story, right? Your Honor, the plan prohibits certain. The plan does not cover, it doesn't prohibit certain treatments. That's what we're looking at, not people. The question is whether you qualify for that treatment. We're talking about, this is what a facial determination is. On his face, is there a suspect, quasi-suspect classification? And if here is sex, tell me how do you not determine that solely based on determination what their sex was at birth? Because, for example, in many things you cover, if you have your birth sex was the same. But here, it's excluded because it's different, right? No. Do you know what a sex change is? I'm sorry? What is a sex change? Well, that is actually a subject of quite considerable discussion in the record below. No, in fairness, because there's an evolving question about what are the treatments that are medically necessary and which ones are not. Is it just mastectomies? Is it facial shaping? Is it shoulder shaping? That's the whole thing. No matter how meritorious medically it is requiring, you categorically refuse it, exclude it, because it constitutes a sex change. It is taking you to a physical genitalia condition that's different than your physical sex at birth. That alone excludes it. How do you get around that? The risk that you will need that treatment is not covered by the plan. I have a clarifying question about that. I thought earlier you said the plan would not cover detransitioning. Correct me if I'm wrong, but I thought that means it wouldn't cover a change to go back to your birth sex. It wouldn't cover a change in either direction. It doesn't have to be going from sex assigned at birth to a different one. It could be going back to sex assigned at birth, and that is not covered. Is that right? That is correct. That is not covered. Okay. Thank you. Chief? Thank you. You were talking to Judge Harris a minute ago, and then we got derailed a little bit, but I want to come back, just because you had two points, and it seemed like the second one you didn't quite get to, and I just wanted to hear, you know, Judge Harris asked you about Lawrence and whether that was a facial classification under the Equal Protection Clause. I haven't read Lawrence in a while, but I thought it was a Due Process Clause case, but then I also wanted to hear you remind me if I'm right or wrong about that, or if you remember. And then second, you said you wanted to talk about Obergefell, and so I wanted to get your take on whether you thought Obergefell sort of supported or undermined Judge Harris's question. No, I think . . . thank you, Your Honor. I think the critical . . . what's getting mixed in sort of the analysis and the discussion here is, what is the facial classification? And not . . . again, we're not claiming that there's not other ways to find violations of the Equal Protection Clause. We're simply starting with, is there a facial classification? And the courts . . . in Obergefell, it's sex. That determines whether or not you're able to marry the person of your choosing. If that person is of the same sex, you couldn't. If the person was of a different sex, you could. In loving, race is the decision-making factor. In this case, neither transgender status nor biological sex is the basis for determining whether or not you can get these procedures. It's simply, you can . . . we don't cover them for anyone. We don't cover them to affirm your current biological sex. We don't cover them to change your biological sex. We don't look at the reason you're seeking them. We simply don't cover them. Now, does that mean that you can't prove discrimination? In a lot of the discussion of cost and discussion of the record that was developed in this case, we think that's absolutely relevant to decision-making, but that's relevant at the trial stage when considering the motive, which is where the court has, for many years, relied on that process to sniff out this kind of proxy discrimination. But the classes are . . . does this distinguish on its face between people of one sex and another allocating benefits on that basis? Does this distinguish between people who are transgender on its face allocating benefits on that basis? And it does not. Thank you, Mr. Knepper. One last question. I'm going to have some gadoodling. You said in gadoodling that it's definitely a normal pregnancy. Would the result have been different if the policy said women who are pregnant? Thank you, Your Honor. That was on my list of things that I wanted to get to. The court itself says only women can get pregnant. I mean, you can't . . . the court's reasoning was that this was a policy that only affected women. But if the policy itself said women who are pregnant, or the policy here said transgender people who have this form, would that be a problem? Would that be exclusive? Your Honor, I . . . I think the answer is yes, when you're distinguishing. I mean, the follow-on cases from gadoodling distinguish between things like pregnancy or, in this case, the need for a specific treatment from . . . And then they go on to say that where you're making the explicit distinction in the premiums charge, men pay this, women pay that, the court actually says, no, that's a violation of equal protection because you're making that facial classification, and men and women are getting different benefits based on that fact alone. And that's . . . Thank you, Your Honor. Thank you, Mr. Knepper. When former Chief Judge Gregory assigned me the reins to the circuit, he said that there might not be anything attached to them sometimes, and that's sometimes the case. But . . . But I will say this was a . . . This was a very thoughtful argument. I appreciate it on behalf of the court on a very important case, obviously, and I thought that counsel's presentations were able and efficient and certainly helpful to the court. And for that, we thank you both. We're going to come down and greet you, and then take a short recess before we move on to our second case.
judges: Diaz, Wilkinson, Niemeyer, King, Gregory, Agee, Wynn, Thacker, Harris, Richardson, Quattlebaum, Rushing, Heytens, Benjamin